## MECHANICS' LIENS—BUILDING AND LOAN COMPANIES.

2 Dec.
567

[Lucas Circuit Court, March 16, 1895.]

### JOSEPH . KESTING V. LENA DONAHOE.

1. PAYMENT BY NOTE AND MORTGAGE TO PRINCIPAL CONTRACTOR TO DIVEST SUBCONTRACTORS, ETC., OF A RIGHT TO A LIEN.

   Under the mechanics' lien statutes if the owner as a part payment on a past due installment, owing to the principal contractor in good faith, execute and deliver to the said contractor his note and mortgage securing the same, upon the premises in question, which note and mortgage is so received as payment by the contractor, the same will be considered a valid payment, although subcontractors and material men may still be unpaid.

2. PAYMENTS BY A BUILDING AND LOAN COMPANY, IN VIOLATION OF ORDERS FROM OWNER.

   A building and loan company having undertaken to loan to the owner a certain sum of money, and also undertook with his consent to pay the same upon his order. and as it should be needed in paying for the work and material done and performed upon a building, then in course of erection, the said building and loan company must regard the orders given it by said owner, and pay the money only as he directs, or if it pays in violation of his order, or without his knowledge, it will not be protected in such payment.

3. RIGHT OF BUILDING AND LOAN COMPANY TO FINE AND ASSESS.

   The mortgagor, not having defaulted on any conditions of his mortgage, cannot be fined or assessed by a building and loan company mortgage, a sum, for an attorney's fee, incurred in maintaining a claim which is by the court found invalid.

KING, J.

This case comes into this court on appeal from the common pleas court of this county. The action is brought by Joseph Kesting to foreclose a mechanics' lien, and to establish the amount, validity and priority of mechanics' liens, as well as certain mortgages.

The plaintiff was a subcontractor, who did the mason work under a contract with the defendant, Michael Weibel, the principal contractor, and the other lienors are material and labor men who furnished material and labor for Michael Weibel, the principal contractor, and upon the building in question. The evidence in the case establishes without contradiction, the following facts:

That the defendant, Lena Donahoe, was the owner of a lot in Toledo, and her husband, Michael Donahoe, desired to erect thereon a building to be used as a residence and store room. Having no money to pay for the building, he applied to the defendant, The Mutual Aid Building and Loan company, by a written application, dated May 15, 1893, to which is signed the name of Lena Donahoe and of Michael Donahoe, and in this case, so far as Michael has acted, he has acted as the agent of his wife. The application for a loan was referred by the Loan company to a committee to examine the property, and the committee made a report in writing, finding that the lot was worth $750; that it was proposed to erect a

building thereon worth about $2,600, and they recommended that the loan be made to the amount of $2,200. This application and report was then referred to the attorney of the corporation, and on June 15, a month after the original application was signed, reported that the title of the property was all right, and on June 15, 1893, Michael Donahoe and his wife, executed to the Loan company a mortgage upon these premises for the sum of $2,200, the mortgage reciting that the money has been paid, and is, in the mortgage receipted for. It was, however, outside of the mortgage, the understanding of the parties that it should not all of it be then paid. On the 20th of May, five days after the application to the Loan company had been made, and probably after Mr. Donahoe had received an assurance that the Loan company would let him have the money, he entered into a contract with Michael Weibel to erect and complete the building in question for the sum of $2,698, to be payable in installments as the work progressed. On June 15, the first installment became due on this contract, that, by the terms of it being payable when the cellar walls should be up ready to receive the superstructure. And on this day, as before stated, the Building and Loan company received the mortgage, and on that day advanced and paid on account of their agreement to loan the sum of $23.60, to Mr. Donahoe and on his order paid to Weibel, the contractor, $500, making the total sum $523.60.

On the 24th day of July a second installment became due to Michael Weibel on the contract, and the Loan company were again called upon to make a payment. Before making a second payment, they required that the owner and Weibel, the contractor, should execute a paper setting forth the material conditions of the contract between them, and on the part of Weibel waiving any right to a mechanics' lien. This having been signed both by Donahoe and Weibel, the Loan company on that day paid directly to Donahoe $56, and to Weibel on the order of Donahoe $600, making on that day, $656, or a total payment up to this date of $1,179.60.

On August 8, they paid to Donahoe directly $28 more, making the total amount advanced on account of the loan, $1,207.60, and then leaving to be yet advanced, $992.40. It appears that of the $600 paid to Weibel $550 went directly to the defendants, Chesbrough Bros., and this was with the knowledge of the Loan company. Chesbrough Bros. had furnished some lumber towards the erection of the building and had an account for it amounting to about $550, but the contractor, Weibel, was indebted to them in an amount of more than $600 for material furnished for other buildings.

On August 22, 1893, the building was nearly completed. The work then remaining to be done was afterwards performed at a cost of $117.55. At this date the work came to a standstill and Weibel was unable to pay his men, and they refused to work until paid. The material men were also demanding their pay; the Loan company was also insisting that as it appeared that Donahoe would have to borrow more money in order to pay the entire contract price, that he should make such arrangement, which must in any event be subsequent to the lien of the Loan company, and which would release the contract to the extent of the difference between the amount to be furnished by the Loan company, and the amount of the contract, which including certain small sums advanced to Donahoe was said to be about $600.

Donahoe undertook to borrow that amount of money, but could find no one willing to loan it, and take a mortgage subject to the Loan company's mortgage, until after some talk Weibel had arranged with Chesbrough Bros. to accept from him, Weibel, as a payment on his indebtedness to them a mortgage for $600, to be given by Donahoe, subject to the mortgage of the Loan company, and which mortgage Weibel was willing to accept as a payment to him on the contract of $600. Accordingly Donahoe and his wife gave the note and mortgage for $600 to Weibel, who transferred it to Chesbrough Bros. At this time, August 22, the third installment, amounting to $800, was past due. The work required to be performed in the contract before it was due had been completed,

and some additional. No liens had been filed, no notice had been served of an intention to procure liens, although Donahoe knew that the labor men, many of them had not been paid, but he gave the mortgage and note to satisfy his contract with Weibel to the extent of $600, and because the Loan company had so far refused to advance any more money until some arrangement should be made having this effect. Thereupon Donahoe and Weibel went to the office of the Loan company. What took place there is in dispute.

We find from the evidence that a Mr. Schmitt, was the secretary of the Loan company, and was in the office at the time when Donahoe and Weibel came. That Donahoe and Weibel informed him that the $600.00 that had been previously spoken about, had been arranged for. That Chesbrough Bros. had taken the mortgage. Thereupon Schmitt telephoned to the office of Chesbrough Bros., who responded to the effect that they had done so. Schmitt, on the witness stand, claims that he misunderstood both the conversation and the telephone. That it was his understanding at the time that Chesbrough Bros. had taken a mortgage, and had advanced $600.00 to Donahoe, and he supposed that Weibel had had the benefit of $600.00 in money. There does not appear in the evidence any reason for that understanding. But it is not deemed material. Schmitt had been insisting that Donahoe should take care of the contract to the extent of $600, and the effect of the mortgage made to Weibel and transferred to Chesbrough Bros., was to do exactly that.

We conclude, as a matter of law, that the mortgage was made and accepted by Weibel as a payment upon his contract. That Donahoe had a right to make it in that way, and Weibel a right to accept it, and the mortgage is valid in the hands of Chesbrough Bros., but will be subject to the mortgage of the Loan company.

We further find that when Donahoe and Weibel were in the office of the Loan company, Donahoe informed Schmitt that the laboring men had not been paid, and that they were insisting on their pay, and that he should pay to Weibel on account of the contract, all the money that was coming to him, Donahoe, except about $100. That he should keep back that sum in order to insure the completion of the work yet to be done by Weibel, but that all the balance should be paid over to Weibel. Schmitt replied that the Loan company had no money, but that it would have some soon. And thereupon Donahoe went away. After he had gone Schmitt said to Weibel, who remained, that as he, Weibel, was indebted to the Western Manufacturing company, he had furnished a large amount of material for this building that he might give the Western Manufacturing company an order on the Loan company, or he might say to them that the Loan company would hold for the Manufacturing company $600 of this money, and that the matter could be arranged between the two corporations. In this connection, it should be stated that Mr. Puck is the president of the Loan company, of which Schmitt was the secretary, and was also the secretary and treasurer of the Western Manufacturing company. Weibel proceeded to find Mr. Puck, gave him the information which Schmitt had given him, and Puck informed him that he desired that in writing. Weibel went back and saw Schmitt who gave him the paper which reads as follows:

"We will hold six hundred dollars for your ac't.

"LENA DONAHOE and MICHAEL WEIBEL.

"THE MUTUAL AID BUILDING AND LOAN COMPANY,

"THEO. SCHMITT, *Secretary*."

There is no date upon it. It is written on the back of a blank deposit slip. This paper, which is simply an assurance that the Loan company will hold $600 "for your account" is addressed to nobody and standing alone its meaning would not be plain. Mr. Weibel gave this paper to Mr. Puck, who in a few days returned it to the Loan company. It was not acted upon or paid by the Loan com-

pany until about a month later. The Western Manufacturing company gave nothing for it, and did not in any respect change their position.

Two or three days later than this, possibly on the 26th or 27th of August, Donahoe finding that the laboring men were not paid, that they refused to go on with the work, and nothing was being done to the building, went again to the office of the Loan company, and found in charge a bookkeeper. Mr. Schmitt was not there, and said to the bookkeeper, don't you pay that money to Weibel. The bookkeeper does not appear to have made any response to this.

On the 28th of August, the plaintiff and some of the other laboring and material men filed the liens involved in this case, and Mr. Donahoe went again to the office of the Loan company, and said to the man in charge—Donahoe says it was Schmitt, but Schmitt denies that he was present—that they must not pay that money or any more money to Weibel, and the man in charge replied, "We have paid it." As I have before stated, they had paid nothing, and did not pay until later. It is now claimed by the Loan company that they should be entitled to a credit of $600 as advanced upon this loan, which they afterwards paid to the Western Manufacturing company, and that the lienors are not entitled to any claim upon the money as a fund in their hands. We do not think this claim can be upheld. It does not appear that Donahoe was negligent in any way. He ordered the secretary to the pay the amount due upon his contract to the contractor. If the secretary had obeyed that order, and the contractor had himself applied the money, the Loan company would not have been responsible for that, but the Loan company did not pay the contractor. They made an arrangement by which they should pay at some time, another corporation, with which Donahoe had no relation. So far as the evidence shows, Donahoe did not know that Weibel was indebted to the Western Manufacturing company. He did know that Weibel was indebted to several workmen, and he had insisted that the money to be advanced to him by the Loan company should be paid over to Weibel to enable Weibel to satisfy the claims of these workmen. This he had said to the secretary of the Loan company. He gave the Loan company no direction to do anything with his money, except to pay it to Weibel. In this situation of the parties, we must hold that the assumption by the Loan company of an obligation to pay the Western Manufacturing company $600, and which they did not pay until about a month later, was unauthorized by Donahoe, who had the sole right to direct the payment of this money, upon which he was paying interest for its use, to the Loan company.

And we conclude that the Loan company still has of the amount it agreed to loan Donahoe the sum of $992.40, out of which the lienors have agreed there should be paid the amount necessary to complete the building to the extent of $117.55, leaving in the hands of the Loan company, for the use of Donahoe, the sum of $874.85, with interest on the same from the date when it ought to have been paid to Donahoe, September 20, 1893, which amount and interest to the date of payment the Building and Loan Company are ordered to pay into court.

We find that at the date when payment was stopped, and this trouble arose, there was due Weibel on his contract the sum of $867.95 from Donahoe.

That the plaintiff and the other lienors are entitled to liens, the amount and priority of which, the parties can arrange among themselves, as there has been before us no dispute as to the amounts and priorities. That these lienors are entitled to liens upon the building and premises of the defendants, Michael and Lena Donahoe, to the amount and for the sum that is remaining unpaid on the contract to the principal contractor, and which liens will be extinguished from the money paid into court, as hereinbefore required. And from which money when paid in there will first be paid the costs incurred in this action in the court of common pleas, and the balance shall be paid to the lienors, except that from the amount found due the plaintiff, there shall be repaid to Michael Donahoe the sum of $50, that being the sum agreed upon between the plaintiff and Michael Donahoe for some alleged defects in that portion of the work performed by the plaintiff.

We further find that the costs of the trial in this court should be paid by the defendant, the Mutual Aid Building and Loan company. It is claimed by the Mutual Building and Loan company, that under the contract they are entitled to an allowance for attorney's fees for the sum of $30. We disallow this claim on the ground that they were not entitled to foreclose their mortgage, that Donahoe was not in default, and the conditions had not happened upon which any such provision in the mortgage would become operative.

*R. S. Holbrook*, Attorney for Plaintiff.

*E. W. Tollerton*, Attorney for Chesbrough Bros.

*Gill*, Attorney for M. Donahoe.

*O. S. Brumbach*, Attorney for Mutual Aid Building and Loan Co.